**No. 20-2254, 20-2897**

**IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

AARON VAUGHN,
*Plaintiff-Appellant*,
v.

CORRECTIONAL OFFICER IMOHOFF, *ET AL.*,
*Defendants-Appellees,*

ISAAC RAY VAUGHAN, JR.,
*Plaintiff-Appellant*,
v.

ALBION-SCI, *ET AL.*,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Pennsylvania
Nos. 2-17-cv-00546 and 1-18-cv-00116

**BRIEF OF *AMICI CURIAE* THE AMERICAN CIVIL LIBERTIES UNION, THE AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA, THE AMERICAN CIVIL LIBERTIES UNION OF DELAWARE, THE AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY, AND THE ABOLITIONIST LAW CENTER IN SUPPORT OF PETITION FOR PANEL REHEARING AND REHEARING *EN BANC***

Jennifer A. Wedekind
AMERICAN CIVIL LIBERTIES UNION
915 15th Street NW
Washington, DC 20005
(202) 548-6610
jwedekind@aclu.org

Witold J. Walczak
ACLU OF PENNSYLVANIA
P.O. BOX 23058
Pittsburgh, PA 15222
412-681-7864
vwalczak@aclupa.org

*Counsel for Amici Curiae*
*(Additional counsel on inside cover)*

Dwayne J. Bensing
ACLU OF DELAWARE
100 W. 10 Street, Suite 706
Wilmington, DE 19801
(302) 295-2113
dbensing@aclu-de.org

Jeanne LoCicero
ACLU OF NEW JERSEY FOUNDATION
570 Broad Street, 11th Floor
P.O. Box 32159
Newark, NJ 07102
(973) 854-1715
JLocicero@aclu-nj.org

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

INTEREST OF *AMICI CURIAE* .......... 1

INTRODUCTION .......... 3

ARGUMENT .......... 5

I. Prison Grievance Systems Are Rife With Barriers That Prevent Exhaustion Of Administrative Remedies. .......... 5

II. Common Characteristics Of Incarcerated People Prevent Successful Exhaustion. .......... 11

III. Courts Should Not Hesitate To Find Administrative Remedies Unavailable And Safeguard Access To The Courts. .......... 12

CONCLUSION .......... 15

CERTIFICATIONS .......... 17

# TABLE OF AUTHORITIES

## Cases

*Bounds v. Smith*,
430 U.S. 817 (1977) .......... 14, 15

*Bracero v. Sec'y, Fla. Dep't of Corr.*,
748 F. App'x 200 (11th Cir. 2018) .......... 7

*Chatman v. Johnson*,
No. CV S-06-0578 MCE EFB P, 2007 WL 2023544 (E.D. Cal. July 11, 2007), *report and recommendation adopted*, No. CV S-06-0578 MCE EFB P, 2007 WL 2796575 (E.D. Cal. Sept. 25, 2007) .......... 7

*Craft v. Middleton*,
No. CIV-11-925-R, 2012 WL 3886378 (W.D. Okla., Aug. 20, 2012), *report and recommendation adopted*, 2012 WL 3872010 (W.D. Okla., Sept. 6, 2012) .......... 10

*Fischer v. Smith*,
No. 10-C-870, 2011 WL 3876944 (E.D. Wis., Aug. 31, 2011) .......... 7

*Freeland v. Ballard*,
No. 2:14-cv-29445, 2017 WL 337997 (S.D. W.Va. Jan. 23, 2017) .......... 6

*Hardy v. Shaikh*,
959 F.3d 578 (3d Cir. 2020) .......... 14

*Jones v. Bock*,
549 U.S. 199 (2007) .......... 10

*Lewis v. Casey*,
518 U.S. 343 (1996) .......... 15

*Mack v. Klopotoski*,
540 F. App'x 108 (3d Cir. 2013) .......... 7

*Richardson v. Spurlock*,
260 F.3d 495 (5th Cir. 2001) .......... 6

*Ross v. Blake*,
578 U.S. 632 (2016) .................................................. 4, 9, 13, 14, 15

*Simpson v. Greenwood*,
No. 06-C-612-C, 2007 WL 5445538 (W.D. Wis., Apr. 6, 2007) ........... 6

*Snowden v. Prada*,
No. CV 12-1466, 2013 WL 4804739 (C.D. Cal. Sept. 9, 2013) (California) .................................................. 10

*Whitener v. Buss*,
268 F. App'x 477 (7th Cir. 2008) .................................................. 6

**Statutes**

42 U.S.C. § 1997e(a) .................................................. 1, 3

Fla. Stat. § 627.4145(1)(a) .................................................. 8

**Other Authorities**

141 CONG. REC. H1480 (daily ed. Feb. 9, 1995) (statement of Rep. Charles Canady) .................................................. 13

141 CONG. REC. S 14,627 (daily ed. Sept. 29, 1995) (statement of Sen. Orrin Hatch) .................................................. 13

Alison M. Mikkor,
*Correcting for Bias and Blind Spots in PRLA Exhaustion Law*, 21 GEO. MASON L. REV. 573 (2014) .................................................. 6, 9

Bobby D. Rampey, *et al.*, U.S. Dep't of Edu.,
Highlights from the U.S. PIAAC Survey of Incarcerated Adults: Their Skills, Work Experience, Education, and Training (Nov. 2016), https://nces.ed.gov/pubs2016/2016040.pdf ........................... 11

Dep't of Corr., DC-ADM001: Inmate Abuse. .................................................. 8

Dep't of Corr., DC-ADM804: Inmate Grievance System. ....................... 7

Derek Borchardt,
*The Iron Curtain Redrawn Between Prisoners and the Constitution*, 43 COLUM. HUM. RTS. L. REV. 469 (2012) ...............5, 10

HUMAN RIGHTS WATCH,
NO EQUAL JUSTICE: THE PRISON LITIGATION REFORM ACT IN THE UNITED STATES (June 2009), https://www.hrw.org/sites/default/files/reports/us0609web.pdf ..6, 10

LAURA M. MARUSCHAK, *ET AL.*, BUREAU OF JUST. STAT.,
DISABILITIES REPORTED BY PRISONERS (Mar. 2021), https://bjs.ojp.gov/content/pub/pdf/ drpspi16st.pdf. .........................12

LAURA M. MARUSCHAK, *ET AL.*, BUREAU OF JUST. STAT.,
INDICATORS OF MENTAL HEALTH PROBLEMS REPORTED BY PRISONERS (June 2021), https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/imhprpspi16st.pdf ..........................................................................11

M.C. ESCHER COLLECTION,
https://mcescher.com/gallery/impossible-constructions/# (last visited Oct. 2, 2023) ......................................................................3

Margo Schlanger & Giovanna Shay,
*Preserving the Rule of Law in America's Jails and Prisons: The Case for Amending the Prison Litigation Reform Act*, 11 U. PA. J. CONST. L. 139, 148 (2008)..................................................................6

Margo Schlanger,
*Inmate Litigation*, 116 HARVARD L. REV. 1555, 1694 (2003)............13

National Institute of Mental Health,
*Mental Illness*, https://www.nimh.nih.gov/health/statistics/mental-illness#part_2539 (last visited Oct. 5, 2023)...................................11

U.S. DEP'T OF JUST., BUREAU OF JUST. STAT.,
FEDERAL PRISONER STATISTICS COLLECTED UNDER THE FIRST STEP ACT, 2021 (Nov. 2021), https://bjs.ojp.gov/library/publications/federal-prisoner-statistics-collected-under-first-step-act-2021.................................................11

U.S. Social Security Admin.,
*Programs Operations Manual System*, NL 10605 *et seq* (2015),
https://secure.ssa.gov/apps10/poms.nsf/lnx/0910605101 ....................8

## INTEREST OF *AMICI CURIAE*[1]

The **American Civil Liberties Union** ("ACLU") is a nationwide, nonprofit, nonpartisan organization with nearly 2 million members, dedicated to the principles of liberty and equality embodied in the Constitution and this Nation's civil rights laws. The ACLU established the National Prison Project ("NPP") in 1972 to protect and promote the civil and constitutional rights of incarcerated people. NPP has been involved in litigation concerning the interpretation of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), since the statute's enactment, both as counsel and as *amicus curiae*. The **American Civil Liberties Union of Pennsylvania**, the **American Civil Liberties Union of Delaware**, and the **American Civil Liberties Union of New Jersey** are state affiliates of the ACLU.

The **Abolitionist Law Center** ("ALC") is a non-profit public interest organization dedicated to defending and expanding the rights of incarcerated people and challenging state violence through advocacy,

---

[1] This brief has not been authored, in whole or in part, by counsel to any party in this appeal. No person, other than the amici, their members, or their counsel, contributed money that was intended to fund preparation or submission of this brief.

public education, and litigation. The ALC has litigated numerous cases against Pennsylvanian jails and prisons for violating the constitutional and statutory rights of those held in custody at the facility, including cases challenging excessive force, unconstitutional solitary confinement, denial of medical and mental health care, inadequate precautions in response to the COVID-19 pandemic, and infringement on the rights provided to people with disabilities under the Americans with Disabilities Act.

## INTRODUCTION

Under the Prison Litigation Reform Act ("PLRA"), incarcerated plaintiffs must exhaust "available" administrative remedies before filing suit in federal court. 42 U.S.C. § 1997e(a). But in the PLRA era, prison grievance procedures often resemble the optical illusions of M.C. Escher, with circular stairways and unreachable doors.[2]

Complex grievance procedures often present insurmountable obstacles that incarcerated plaintiffs cannot overcome. As a result, they are forever barred from obtaining judicial redress. In many cases, these procedural barriers exist by design. Prison administrators create grievance requirements and can implement procedures that will virtually immunize themselves and their staff from suit.

Incarcerated people also face additional barriers, including disproportionately high rates of disabilities and mental illness, and disproportionately low rates of English proficiency and literacy. As a result, they often are unable to successfully navigate the grievance

[2] M.C. ESCHER COLLECTION, https://mcescher.com/gallery/impossible-constructions/# (last visited October 2, 2023).

process and are thus prevented from seeking judicial relief for serious civil rights violations.

But the PLRA was intended to limit frivolous litigation—not to keep meritorious cases out of court. And the statute contains a "built-in" exception to the exhaustion mandate: Incarcerated plaintiffs need only exhaust "available" remedies. *Ross v. Blake*, 578 U.S. 632, 635–36 (2016).

When considering availability, courts must bear in mind the "real-world workings of prison grievance systems." *Id.* at 643. In the "real world," grievance systems frequently are so convoluted that "no ordinary prisoner can discern or navigate" them. *Id.* at 644. In the "real world," staff actions may "thwart" incarcerated plaintiffs from successfully exhausting. *Id.* at 643–44. In these circumstances, among others, administrative remedies are "practically speaking, incapable of use[,]" and courts must find remedies unavailable. *Id.* at 643. Failure to do so runs afoul of Supreme Court law, results in excluding a large portion of the incarcerated population from accessing the courts, and raises serious constitutional concerns.

The Court should therefore grant rehearing en banc to consider the real-world workings of the grievance system at hand. Here, the circular instructions set out in two lengthy, complex policy documents, and staff interference with the plaintiffs' attempts to grieve, rendered remedies "practically speaking, incapable of use" and therefore unavailable.[3]

## ARGUMENT

### I. Prison Grievance Systems Are Rife With Barriers That Prevent Exhaustion Of Administrative Remedies.

Complex grievance procedures present significant obstacles to the courthouse doors and may act as complete barriers to justice for many incarcerated people.

Grievance systems typically require multiple steps, including an informal resolution attempt, a formal grievance, and one or two appeals.[4] At each stage, grievants must meet tight deadlines, which are

---

[3] *Amici* address only the application of the PLRA's administrative exhaustion provision and take no position on the panel's holding regarding magistrate judges and the scope of their jurisdiction.

[4] *See* Derek Borchardt, *The Iron Curtain Redrawn Between Prisoners and the Constitution*, 43 COLUM. HUM. RTS. L. REV. 469, 492–94 (2012).

frequently less than two weeks and can be as short as two days.[5] Any misstep during the grievance process can forever foreclose incarcerated plaintiffs from pursuing their civil rights claims in federal court.[6] For example, incarcerated plaintiffs may lose their claims for including multiple issues in a single grievance,[7] or for failing to name implicated staff members with sufficient specificity.[8]

Even the most minor of technical errors can prove fatal.[9] For example, filing an "administrative" appeal rather than a "disciplinary" appeal can lead to dismissal for failure to exhaust.[10] So can mailing multiple grievances in a single envelope rather than separately mailing

---

[5] Margo Schlanger & Giovanna Shay, *Preserving the Rule of Law in America's Jails and Prisons: The Case for Amending the Prison Litigation Reform Act*, 11 U. PA. J. CONST. L. 139, 148 (2008).

[6] *See* Alison M. Mikkor, *Correcting for Bias and Blind Spots in PLRA Exhaustion Law*, 21 GEO. MASON L. REV. 573, 575–76 (2014).

[7] *See, e.g.*, *Simpson v. Greenwood*, No. 06-C-612-C, 2007 WL 5445538, at *2–5 (W.D. Wis. Apr. 6, 2007).

[8] *See, e.g.*, *Whitener v. Buss*, 268 F. App'x 477 (7th Cir. 2008).

[9] HUMAN RIGHTS WATCH, NO EQUAL JUSTICE: THE PRISON LITIGATION REFORM ACT IN THE UNITED STATES, at 14 (June 2009), https://www.hrw.org/sites/default/files/reports/us0609web.pdf.

[10] *Richardson v. Spurlock*, 260 F.3d 495, 499 (5th Cir. 2001).

each one;[11] submitting handwritten copies instead of photocopies even if the photocopier is broken;[12] submitting carbon copies instead of originals;[13] submitting an appeal to the "Inmate Appeals Branch" instead of the "appeals coordinator";[14] or writing below a form's line that instructs "do not write below this line."[15]

Further, grievance procedures are generally presented in lengthy policy documents—filled with complex language, cross references, and multiple attachments—that may be difficult to understand. The grievance policy here, ADM804, is a 35-page document that includes multiple forms, and cross references seven other policies, including ADM001. S*ee generally* Dep't of Corr., DC-ADM804: Inmate Grievance

[11] *Freeland v. Ballard*, No. 2:14-cv-29445, 2017 WL 337997, at *6–7 (S.D. W.Va. Jan. 23, 2017).

[12] *Mack v. Klopotoski*, 540 F. App'x 108, 112–13 (3d Cir. 2013).

[13] *Fischer v. Smith*, No. 10-C-870, 2011 WL 3876944, at *2 (E.D. Wis. Aug. 31, 2011).

[14] *Chatman v. Johnson*, No. CV S-06-0578 MCE EFB P, 2007 WL 2023544, at *6 (E.D. Cal. July 11, 2007), *report and recommendation adopted*, 2007 WL 2796575 (E.D. Cal. Sept. 25, 2007).

[15] *Bracero v. Sec'y, Fla. Dep't of Corr.*, 748 F. App'x 200, 203 (11th Cir. 2018).

System.[16] The document is rated "difficult to read" by the Flesch Reading Ease Score, and requires college level reading skills to understand, according to the Flesch-Kincaid Grade Level assessment.[17] The "Inmate Abuse" policy, ADM001, is even more complex. S*ee generally* Dep't of Corr., DC-ADM001: Inmate Abuse.[18] It is rated "very difficult to read" and requires college graduate level reading skills to understand.[19] Indeed, policies like these, that attorneys and federal judges must painstakingly review, compare, and interpret to elucidate

---

[16]https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/804%20Inmate%20Grievances.pdf

[17] ADM804 has a Flesch Reading Ease score of 32.7 ("difficult to read") and a Flesch-Kincaid Grade Level of 14.1 ("college"), according to calculations by Microsoft Word. The Flesch-Kincaid reading ease and grade level assessments are used widely, including as built-in tools in Microsoft Word, and by government agencies and in statute. *See, e.g.*, U.S. Social Security Admin., *Programs Operations Manual System*, NL 10605 *et seq* (2015), https://secure.ssa.gov/apps10/poms.nsf/lnx/0910605101 (aiming for a sixth- to eighth-grade reading level for notices); Fla. Stat. § 627.4145(1)(a) (requiring insurance policies be "readable," based on Flesch reading ease test).

[18]https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/001%20Inmate%20Abuse.pdf

[19] ADM001 has a Flesch Reading Ease score of 17.8 ("very difficult to read") and a Flesch-Kincaid Grade Level of 16.6 ("college graduate"), according to calculations by Microsoft Word.

their operation and meaning, may be completely inaccessible to incarcerated plaintiffs.

By imposing needlessly complex requirements that make it all but impossible to successfully navigate the grievance process, prison administrators prevent incarcerated plaintiffs from vindicating their rights in federal court. This should come as no surprise—prison officials "have a tangible stake" in whether incarcerated people exhaust their administrative complaints.[20] Prison administrators—typically the named defendants in prisoner lawsuits—design the grievance procedures that incarcerated plaintiffs must satisfy prior to suing, creating a perverse incentive to make grievance processes as impenetrable as possible. Indeed, "[i]t is their pocketbooks, their professional reputations, and in some cases their very livelihoods that are made vulnerable if a prisoner successfully exhausts his claims."[21] With any minimum requirements for grievance systems swept away by the PLRA, prison officials can effectively control access to the courthouse. *See Ross*, 578 U.S. at 641 ("Differing markedly from its

---

[20] *See* Mikkor, *supra* n.6 at 581.

[21] *Id.*

predecessor," the PLRA "removed the conditions that administrative remedies be plain, speedy, and effective and that they satisfy minimum standards." (cleaned up)).

Indeed, since the PLRA's enactment, many grievance procedures "have been updated in ways that cannot be understood as anything but attempts at blocking lawsuits."[22] In both Illinois and California, after courts rejected officials' arguments that grievances weren't specific enough, officials revised their policies to require the name and position of every staff member involved, dates, and other details.[23] And Oklahoma added a requirement that every page of a grievance be notarized.[24] Because "[i]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion[,]" *Jones v. Bock*, 549 U.S. 199, 218 (2007), officials' ability to needlessly complicate grievance procedures is limited only by their own creativity.

---

[22] Borchardt, *supra* n.4 at 473.

[23] *See Snowden v. Prada*, No. CV 12-1466, 2013 WL 4804739, at *7 (C.D. Cal. Sept. 9, 2013) (California); HUMAN RIGHTS WATCH, *supra* n.9 at 12 (Illinois).

[24] *See Craft v. Middleton*, No. CIV-11-925-R, 2012 WL 3886378, at *3 (W.D. Okla. Aug. 20, 2012), *report and recommendation adopted*, No. CIV-11-925-R, 2012 WL 3872010 (W.D. Okla. Sept. 6, 2012).

## II. Common Characteristics Of Incarcerated People Prevent Successful Exhaustion.

The complexities of grievance procedures may stump even the most proficient jailhouse lawyers. And many incarcerated people face additional barriers that diminish or eviscerate their ability to successfully exhaust. Incarcerated people have disproportionately low rates of educational attainment,[25] English proficiency,[26] and literacy.[27] Meanwhile, the prevalence of mental illness and disability among incarcerated people is disproportionately high. Approximately 41% of prisoners have a history of mental health problems,[28] compared to

---

[25] *See*, *e.g.*, U.S. DEP'T OF JUST., BUREAU OF JUST. STAT., FEDERAL PRISONER STATISTICS COLLECTED UNDER THE FIRST STEP ACT, 2021, at Table 1 (Nov. 2021), https://bjs.ojp.gov/library/publications/federal-prisoner-statistics-collected-under-first-step-act-2021 (28.3% of federal prisoners have no high school diploma, general equivalency degree, or equivalent).

[26] *Id.* (11.4% of federal prisoners report English as a second language).

[27] BOBBY D. RAMPEY, *ET AL.*, U.S. DEP'T OF EDU., HIGHLIGHTS FROM THE U.S. PIAAC SURVEY OF INCARCERATED ADULTS: THEIR SKILLS, WORK EXPERIENCE, EDUCATION, AND TRAINING, at Table 1.2 (Nov. 2016), https://nces.ed.gov/pubs2016/2016040.pdf (29% of state and federal prisoners fell into the two lowest levels of a six-level literacy scale, compared to 19% of the general population).

[28] LAURA M. MARUSCHAK, *ET AL.*, BUREAU OF JUST. STAT., INDICATORS OF MENTAL HEALTH PROBLEMS REPORTED BY PRISONERS, at 1 (June 2021), https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/imhprpspi16st.pdf.

about 23% of the general population.[29] And 38% of prisoners report having a disability—a rate roughly two and a half times greater than the general population.[30] The most commonly reported disability was "cognitive disability."[31] Any or all of these characteristics may make incarcerated people unable to successfully file and pursue a meritorious claim through the prison grievance system.

## III. Courts Should Not Hesitate To Find Administrative Remedies Unavailable And Safeguard Access To The Courts.

The PLRA's mandatory exhaustion requirements, combined with intentionally convoluted grievance regimes, result in untold numbers of incarcerated people being unable to vindicate their rights in federal court, no matter how meritorious the case. As one scholar summarized, incarcerated people "who experience even grievous loss because of unconstitutional behavior by prison and jail authorities will nonetheless

---

[29] National Institute of Mental Health, *Mental Illness*, Fig. 1, https://www.nimh.nih.gov/health/statistics/mental-illness#part_2539 (last visited October 5, 2023).

[30] LAURA M. MARUSCHAK, *ET AL.*, BUREAU OF JUST. STAT., DISABILITIES REPORTED BY PRISONERS, at 1–2 (Mar. 2021), https://bjs.ojp.gov/content/pub/pdf/drpspi16st.pdf.

[31] *Id.* at 1–2.

lose cases they once would have won, if they fail to comply with technicalities of administrative exhaustion."[32]

But the PLRA was not intended to keep meritorious cases out of court based on mere technicalities—and this Court should not interpret it to do so. The statute's sponsors emphasized that the exhaustion requirement was meant to prevent frivolous lawsuits, not to bar serious claims. PLRA sponsor Senator Hatch explained, "I do not want to prevent inmates from raising legitimate claims. The legislation will not prevent those claims from being raised. The legislation will, however, go far in preventing inmates from abusing the Federal judicial system."[33]

Indeed, the statute's plain language includes an exception to the exhaustion requirement: Incarcerated people need only exhaust "available" administrative remedies. *See Ross*, 578 U.S. at 635–36. Grievance procedures are only "available" if they are "capable of use for

---

[32] Margo Schlanger, *Inmate Litigation*, 116 HARVARD L. REV. 1555, 1694 (2003) (footnotes omitted).

[33] 141 CONG. REC. S 14,627 (daily ed. Sept. 29, 1995) (statement of Sen. Orrin Hatch). *See also* 141 CONG. REC. H1480 (daily ed. Feb. 9, 1995) (statement of Rep. Charles Canady) (PLRA "will not impede meritorious claims by inmates but will greatly discourage claims that are without merit.").

the accomplishment of a purpose" and "accessible[.]" *Id.* at 642. Where prison grievance regimes are "so opaque" that they are "practically speaking, incapable of use," remedies are unavailable. *Id.* at 643. And where a grievant is "thwarted" by staff actions, whether innocent or intentional, "such interference with an inmate's pursuit of relief" renders remedies unavailable. *Id.* at 644.

The unavailability exception "has real content." *Id.* at 642. And it is critical that courts enforce it. The PLRA's intent "cannot be realized unless the grievance process to be exhausted is actually available to inmates and faithfully followed by the prisons." *Hardy v. Shaikh*, 959 F.3d 578, 586 (3d Cir. 2020).

Further, the exhaustion requirement must be construed to avoid constitutional conflicts. It is "established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 821 (1977). Incarcerated plaintiffs must "have a reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement." *Lewis v. Casey*, 518 U.S. 343, 356 (1996). Frustrating or impeding such a claim violates the Constitution. *Id.* at 353.

Here, the relevant processes are described in two lengthy documents filled with impenetrable language that sends grievants up a circular staircase. *See supra* pp7–8. *See also* Pet. For Rehearing at 3–4. Along the way, staff thwarted the Plaintiffs' attempts to grieve by withholding required forms and failing to respond. *See* Pet. For Rehearing at 14–16. In these circumstances, administrative remedies were not "capable of use" and were unavailable. *Ross*, 578 U.S. at 642. The Court must therefore grant rehearing to conduct a "thorough review" of the record, *id.* at 648, conform Circuit law to the Supreme Court's dictates in *Ross*, and ensure that the PLRA is not weaponized to prevent meaningful access to the courts, in contravention of *Bounds* and *Lewis*.

## CONCLUSION

For the forgoing reasons, the Court should grant panel rehearing or rehearing en banc.

Dated: October 10, 2023

Respectfully submitted,

/s/ Jennifer A. Wedekind
Jennifer A. Wedekind (DC 1012362)
AMERICAN CIVIL LIBERTIES UNION
915 15th Street NW
Washington, DC 20005
(202) 548-6610
jwedekind@aclu.org

Witold J. Walczak (PA 62976)
ACLU OF PENNSYLVANIA
P.O. BOX 23058
Pittsburgh, PA 15222
412-681-7864
vwalczak@aclupa.org

Dwayne J. Bensing
ACLU OF DELAWARE
100 W. 10 Street, Suite 706
Wilmington, DE 19801
(302) 295-2113
dbensing@aclu-de.org

Jeanne LoCicero
ACLU OF NEW JERSEY FOUNDATION
570 Broad Street, 11th Floor
P.O. Box 32159
Newark, NJ 07102
(973) 854-1715
JLocicero@aclu-nj.org

*Counsel for Amici Curiae*

## CERTIFICATIONS

I hereby certify that:

1. Pursuant to LAR 28.3(d), I hereby certify that I am a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

2. This brief complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 2,594 words.

3. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface with 14-point Century Schoolbook font.

4. Pursuant to LAR 31.1(c), I hereby certify that this brief as provided to the Court in electronic form includes the same text as the paper copies of the brief that will be filed with the Court.

5. Pursuant to LAR 31.1(c), I hereby certify that this brief has been virus scanned by Malwarebytes Premium, version 4.6.4, prior to electronic submission, and no virus was detected.

6. On October 10, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: October 10, 2023

*/s/ Jennifer A. Wedekind*
Jennifer A. Wedekind